Certiorari dismissed, January 9, 2008

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PETRU MIRONESCU,
            *Petitioner-Appellee,*

v.

HARLON E. COSTNER, United States Marshal for the Middle District of North Carolina,
            *Respondent-Appellant,*

and

WILLIAM SCHATZMAN, Sheriff of Forsyth County,
            *Respondent.*

No. 06-6457

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., District Judge.
(1:05-cv-00683-JAB)

Argued: November 28, 2006

Decided: March 22, 2007

Before WILKINS, Chief Judge, WIDENER, Circuit Judge, and
David A. FABER, Chief United States District Judge
for the Southern District of West Virginia, sitting by designation.

Vacated and remanded by published opinion. Chief Judge Wilkins wrote the opinion, in which Judge Widener and Judge Faber joined.

**COUNSEL**

**ARGUED:** Douglas Neal Letter, UNITED STATES DEPARTMENT OF JUSTICE, Civil Division, Appellate Section, Washington, D.C., for Appellant. Gregory Davis, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Winston-Salem, North Carolina, for Appellee. **ON BRIEF:** Peter D. Keisler, Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Washington, D.C.; Anna Mills Wagoner, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellant. Louis C. Allen, III, Federal Public Defender, Greensboro, North Carolina, for Appellee.

---

**OPINION**

WILKINS, Chief Judge:

Harlon E. Costner, United States Marshal for the Middle District of North Carolina ("the Government"), appeals a district court order denying a motion to dismiss Petru Mironescu's habeas corpus petition, *see* 28 U.S.C.A. § 2241 (West 2006), and enjoining the Government from extraditing Mironescu to Romania. Finding that the district court lacked jurisdiction to consider the merits of Mironescu's petition, we vacate and remand for dismissal of the petition.

I.

A.

Before discussing the facts specifically pertaining to this case, we begin with some background regarding the extradition process and the law governing it.

1. *Extradition Procedure*

Extradition is a process by which a fugitive may be returned to another country to face criminal charges. The process begins with the

submission by a foreign government of an extradition request to the United States Department of State. *See Restatement (Third) of Foreign Relations Law* § 478 cmt. a (1987). The State Department then determines whether the request is covered by a treaty. *See id.* If it is, the matter is referred to the Justice Department for screening. *See id.* Assuming that the Justice Department deems the request to be valid, it is referred to the United States Attorney for the district in which the fugitive is believed to be located. *See id.*

At that point, the United States Attorney files a complaint in the district court, seeking certification of the fugitive's extraditability and a warrant for his arrest. *See* 18 U.S.C.A. § 3184 (West Supp. 2006). Once the fugitive is in custody, a district court judge or magistrate judge conducts a hearing to determine whether (1) there is probable cause to believe that the fugitive has violated one or more of the criminal laws of the country requesting extradition; (2) the alleged conduct would have been a violation of American criminal law, if committed here; and (3) the requested individual is the one sought by the foreign nation for trial on the charge at issue. *See Peroff v. Hylton*, 542 F.2d 1247, 1249 (4th Cir. 1976). Provided that these requirements are satisfied and that the applicable treaty provides no other basis for denying extradition, the judge certifies to the Secretary of State (the Secretary) that the fugitive is extraditable. *See* 18 U.S.C.A. § 3184. Although a judge's certification of extraditability is not appealable, a fugitive may obtain limited collateral review of the certification in the form of a petition for a writ of habeas corpus. *See Peroff v. Hylton*, 563 F.2d 1099, 1102 (4th Cir. 1977) (per curiam). In considering such a habeas petition, the district court generally determines only whether the judge had jurisdiction, whether the charged offense is within the scope of the applicable treaty, and whether there was any evidence supporting the probable cause finding. *See Prushinowski v. Samples*, 734 F.2d 1016, 1018 (4th Cir. 1984).

Following certification by the district court, the Secretary must decide whether to extradite the fugitive. *See* 18 U.S.C.A. § 3186 (West 2000) ("The Secretary of State may order the person . . . to be delivered to any authorized agent of such foreign government, to be tried for the offense of which charged."). In deciding whether to extradite, the Secretary may consider "factors affecting both the individual defendant as well as foreign relations—factors that may be

beyond the scope of the . . . judge's review." *Sidali v. INS*, 107 F.3d 191, 195 n.7 (3d Cir. 1997). The broad range of options available to the Secretary includes (but is not limited to) reviewing de novo the judge's findings of fact and conclusions of law, refusing extradition on a number of discretionary grounds, including humanitarian and foreign policy considerations, granting extradition with conditions, and using diplomacy to obtain fair treatment for the fugitive. *See United States v. Kin-Hong*, 110 F.3d 103, 109-10 (1st Cir. 1997).

## 2.   *The CAT and the FARR Act*

A central issue in this appeal is whether the Secretary's discretion in extradition matters has been constrained by Article 3 of the United Nations Convention Against Torture (CAT), *see* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted* Dec. 10, 1984, art. 3, 23 I.L.M. 1027, 1028, 1465 U.N.T.S. 85, 114, and § 2242 of the Foreign Affairs Reform and Restructuring Act (the FARR Act) of 1998, *see* Pub. L. No. 105-277, div. G, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231 note). As is relevant here, Article 3 of the CAT provides:

> 1.   No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.
>
> 2.   For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

23 I.L.M. at 1028.[1] President Reagan signed the CAT on April 18,

---

[1]The CAT defines torture as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession[,] punishing him for an act he or a third person has commit-

1988. The Senate adopted a resolution of advice and consent to the Convention in 1990 but conditioned that consent on its declaration that "the provisions of Articles 1 through 16 of the Convention are not self-executing." 136 Cong. Rec. S17486-01, S17492 (1990). And, the President ratified the CAT for the United States subject to this same declaration. *See Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 211-12 & n.11 (3d Cir. 2003) (recounting ratification history of the CAT).

In light of the Senate's determination that the CAT was not self-executing, Congress enacted the FARR Act to implement the treaty. The FARR Act provides that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being sub-jected to torture, regardless of whether the person is physically pres-ent in the United States." Section 2242(a). It also directs heads of the appropriate agencies to "prescribe regulations to implement the obli-gations of the United States under Article 3." Section 2242(b).

The applicable State Department regulations identify the Secretary as "the U.S. official responsible for determining whether to surrender a fugitive to a foreign country by means of extradition." 22 C.F.R. § 95.2(b) (2006). They provide that "to implement the obligation assumed by the United States pursuant to Article 3 of the Convention, the Department considers the question of whether a person facing extradition from the U.S. 'is more likely than not' to be tortured in the State requesting extradition when appropriate in making this determination." *Id.* They further state that in each case in which there is an allegation relating to torture, "appropriate policy and legal offices [shall] review and analyze information relevant to the case in

---

ted or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on dis-crimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

*Id.* at 1027.

preparing a recommendation to the Secretary as to whether or not to sign the surrender warrant." 22 C.F.R. § 95.3(a) (2006). And, they provide that "[d]ecisions of the Secretary concerning surrender of fugitives for extradition are matters of executive discretion not subject to judicial review." 22 C.F.R. § 95.4 (2006).

B.

Having briefly described the legal landscape in which this appeal arises, we now turn to the facts.

Mironescu was prosecuted and convicted *in absentia* in Romania for various crimes relating to automobile theft. He was sentenced to an aggregate term of four years imprisonment.

Romania submitted a request to the United States for Mironescu's extradition under the applicable treaty between the two countries. After Mironescu was arrested in the United States in 2003, a magistrate judge conducted an extradition hearing, at which Mironescu argued that he had not committed the charged crimes and that the CAT barred his extradition. The judge determined that he lacked authority during an initial extradition hearing to address the CAT allegations and that there was probable cause to believe that Mironescu had committed the charged offenses. *See In re Extradition of Mironescu*, 296 F. Supp. 2d 632, 637-38 (M.D.N.C. 2003). The judge therefore certified Mironescu's extraditability to the Secretary. *See id.* at 638.

Mironescu subsequently petitioned the district court for habeas corpus, contending, *inter alia*, that extradition would violate his rights under the CAT and the FARR Act. The district court ruled that the certification for extradition was valid, but that Mironescu's claims under the CAT and the FARR Act were not ripe for adjudication. *See Mironescu v. Costner*, 345 F. Supp. 2d 538, 540-41 (M.D.N.C. 2004). The court ruled that Mironescu could bring his humanitarian concerns to the Secretary's attention and that the Secretary was required to notify Mironescu of the issuance of any surrender warrant in order to allow him adequate time to consider whether to pursue habeas review.[2]

---

[2]The court reserved ruling on the question of whether habeas review would indeed be available. *See id.*

*See id.* at 541. The court therefore denied Mironescu's habeas petition without prejudice. *See id.*

Upon receiving notification that a warrant to extradite him had been signed by the Secretary, Mironescu filed the present habeas petition.[3] Mironescu asserts that the Secretary has a mandatory duty under the CAT and FARR Act not to extradite a fugitive who is likely to be tortured after his surrender. He further alleges that he presented substantial evidence to the Secretary that he would be tortured if extradited to Romania[4] and that the Secretary's decision to extradite him in the face of such evidence was arbitrary and capricious. Mironescu submits that the district court possesses jurisdiction over his habeas petition because he alleges that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2241(c)(3). He also asserts that the district court has jurisdiction to consider his petition under the Administrative Procedure Act (APA), 5 U.S.C.A. §§ 551-59, 701-06 (West 1996 & Supp. 2006).

The Government moved to dismiss the petition. While conceding that the CAT, the FARR Act, and the implementing State Department regulations require the Secretary to deny extradition if Mironescu would likely face torture in Romania, the Government nevertheless asserted that, based on the common law "rule of non-inquiry," as well as the language of the FARR Act and the APA, the district court lacked authority to review the Secretary's extradition decision.

The district court denied the motion to dismiss, concluding that it possessed jurisdiction "to review whether the Secretary's torture determination as to [Mironescu] was arbitrary, capricious, or not in accordance with law." J.A. 140 (internal quotation marks omitted). The court emphasized that "this review will not consist of a *de novo* review of the record—the Court will not substitute its opinion for the Secretary's as to whether [Mironescu] would face torture upon return to Romania—but will merely determine whether the Secretary did, in

---

[3]Mironescu initially named Secretary of State Condoleeza Rice as a respondent but the district court subsequently dismissed her from the action.

[4]The factual basis for this claim is not relevant to this appeal.

fact, consider [Mironescu's] evidence, if only to subsequently and validly reject it." *Id.* at 144. Having determined that it was obliged to examine the Secretary's reasoning in deciding to extradite Mironescu, the court ordered the Government to produce, for *in camera* review, the administrative record considered by the Secretary with respect to the question of whether Mironescu would be subject to torture.[5] The court also enjoined the Government from surrendering Mironescu to Romanian officials pending its decision.

## II.

## A.

The Government maintains that the district court erred in denying its motion to dismiss Mironescu's petition because claims that an extradition would violate the CAT or the FARR Act may not be raised on habeas. Specifically, the Government argues that the scope of habeas review in extradition cases is limited and the "rule of non-inquiry" bars such claims.

"[U]nder what is called the 'rule of non-inquiry' in extradition law, courts in this country refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely." *Lopez-Smith v. Hood*, 121 F.3d 1322, 1327 (9th Cir. 1997). Understanding the underpinnings of this rule is critical in deciding whether it applies here. The origin of the rule can be traced back to two Supreme Court cases from the late 19th century. *See* Jacques Semmelman, *Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings*, 76 Cornell L. Rev. 1198, 1211 (1991). First, in *Benson v. McMahon*, 127 U.S. 457 (1888), the Court listed the following as the sole issue properly before it on habeas review of an extradition decision: "whether, under the construction of the act of congress and the treaty entered into between this country and Mexico, there was legal evidence before the commissioner to justify him in exercising his power to commit the person accused to custody to

---

[5]The court ruled that all documents produced by the Government could be filed under seal, to reduce concerns of adverse impact on foreign policy interests.

await the requisition of the Mexican government." *Benson*, 127 U.S. at 463. The Court issued the second decision two years later, expanding on this proposition:

> A writ of *habeas corpus* in a case of extradition cannot perform the office of a writ of error. If the commissioner has jurisdiction of the subject-matter and of the person of the accused, and the offense charged is within the terms of a treaty of extradition, and the commissioner, in arriving at a decision to hold the accused has before him competent legal evidence on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused for the purposes of extradition, such decision of the commissioner cannot be reviewed by a circuit court or by this court, on *habeas corpus*, either originally or by appeal.

*Oteiza v. Jacobus*, 136 U.S. 330, 334 (1890). The rule of non-inquiry thus originally was born "by implication," *i.e.*, by virtue of the fact that the treatment a fugitive would likely receive once he was extradited was not listed by the Court as a factor that is properly considered on habeas review of a decision to grant extradition. Semmelman, 76 Cornell L. Rev. at 1211-12. The rule also has some roots in *Neely v. Henkel*, 180 U.S. 109 (1901). *See Yapp v. Reno*, 26 F.3d 1562, 1572 (11th Cir. 1994) (Carnes, Circuit Judge, dissenting). There, the petitioner had filed a writ of habeas corpus challenging extradition to Cuba on the ground that the statute providing the basis for his extradition was unconstitutional, in that it did not secure for him all of the rights he would have under the Constitution if tried in this country. *See Neely*, 180 U.S. at 122. In rejecting that claim, the Court stated:

> When an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States.

*Id.* at 123. Lastly, *Glucksman v. Henkel*, 221 U.S. 508 (1911), provided the final piece of the puzzle. *See United States v. Howard (In re Extradition of Howard)*, 996 F.2d 1320, 1329 (1st Cir. 1993).

There, in the context of analyzing the petitioner's claim that there was insufficient evidence to warrant his extradition, the Court stated,

> [I]f there is presented, even in somewhat untechnical form according to our ideas, such reasonable ground to suppose [the relator] guilty as to make it proper that he should be tried, good faith to the demanding government requires his surrender. We are bound by the existence of an extradition treaty to assume that the trial will be fair.

*Glucksman*, 221 U.S. at 512 (citations omitted).

We conclude that the rule of non-inquiry does not warrant a holding that the district court lacked jurisdiction to review the Secretary's extradition decision on habeas. Most relevant to our conclusion is our decision in *Plaster v. United States*, 720 F.2d 340 (4th Cir. 1983). There, a United States Attorney filed a complaint in district court seeking certification of Plaster's extraditability. *See Plaster*, 720 F.2d at 345. Attached to the complaint were an affidavit from the State Department certifying West Germany's extradition request, pursuant to an extradition treaty between the two countries, as well as various documents establishing Plaster's involvement in a 1965 murder. *See id.* at 345-46. After the court certified Plaster's extraditability, the district court granted a writ of habeas corpus, ruling that extradition would infringe Plaster's due process rights because it would violate the terms of an immunity agreement between him and the United States government. *See id.* at 346.[6]

We affirmed, holding that the district court correctly ruled that it had jurisdiction to enjoin Plaster's extradition when the court determined that his detention was unlawful. *See id.* at 347-51. We recognized that the scope of habeas review of international extradition proceedings has been traditionally described in narrow terms: "whether the magistrate had jurisdiction, whether the offence charged is within the treaty and . . . whether there was any evidence warranting the finding that there was reasonable ground to believe the

---

[6]The district court also concluded that the applicable treaty barred extradition because it prohibited extradition when it would violate the relator's constitutional rights. *See id.*

accused guilty." *Id.* at 347-48 (internal quotation marks omitted). We nevertheless observed that none of the cases describing the review in those terms involved a claim that extradition would be unconstitutional. *See id.* at 348. We explained that the United States must act within the confines of the Constitution when carrying out its treaty obligations, and we noted that "a claim of unconstitutional governmental conduct is within the scope of habeas corpus review mandated by both the Constitution itself and the applicable federal statute." *Id.* (citation omitted); *see In re Burt*, 737 F.2d 1477, 1482-85 (7th Cir. 1984) (holding that district court was correct to consider procedural due process claim as part of its habeas corpus review in an extradition challenge).

In holding that the district court possessed jurisdiction to review the constitutionality of the extradition, we specifically rejected an argument by the government that the district court lacked jurisdiction because "the extradition power of the United States is *sui generis* and commits the consideration of alleged constitutional violations solely to the Secretary of State and the President." *Plaster*, 720 F.2d at 349. We noted that although the Executive has unlimited discretion to *refuse* to extradite a fugitive, it lacks the discretion to extradite a fugitive when extradition would violate his constitutional rights. *See id.* Additionally, we explained that "unquestionably, it is the province of the judiciary to adjudicate claims that governmental conduct is in violation of the Constitution." *Id.*

Our reasoning in *Plaster* is controlling here. The Supreme Court cases describing habeas review of extradition orders, particularly *Benson*, *Oteiza*, and *Glucksman*, did not involve claims that extradition would violate a federal statute, nor did the several Fourth Circuit cases that similarly describe such habeas review.[7] *See Ordinola v. Hackman*, No. 06-6126, slip op.; *Prushinowski v. Samples*, 734 F.2d 1016 (4th Cir. 1984); *Antunes v. Vance*, 640 F.2d 3 (4th Cir. 1981);[8]

---

[7]Additionally, *Glucksman*'s statement that "we are bound by the existence of an extradition treaty to assume that the trial will be fair" has no direct application in this case, in which the fairness of Mironescu's trial is not in dispute.

[8]Antunes maintained that he was denied due process in his extradition hearing but did not argue that extradition would violate federal law. *See Antunes*, 640 F.2d at 4.9

*Collier v. Vaccaro*, 51 F.2d 17 (4th Cir. 1931). Moreover, the Government concedes that the FARR Act precluded the Secretary from extraditing Mironescu to Romania—also a signatory to the CAT, *see* Status of ratification of the Convention against Torture, *http://www.ohchr.org/english/law/cat-ratify.htm* (last visited Jan. 3, 2007)—if he was likely to be tortured there. *See* Br. for the Appellants at 14 (noting that before the district court "[t]he Government recognized that the Secretary of State is bound by the policy of the [CAT] as implemented by U.S. domestic legislation and State Department regulations, and that Mironescu thus could not be extradited to Romania if it was likely he would indeed be tortured there"); *id.* at 26 ("[W]e are not arguing that the Secretary of State has the authority to extradite a fugitive who is likely to be tortured."). *But see Cornejo-Barreto v. Siefert (Cornejo-Barreto II)*, 379 F.3d 1075, 1088 (9th Cir.) (concluding that the FARR Act does not eliminate the Secretary's discretion to extradite an individual likely to face torture in the requesting country), *vacated as moot*, 389 F.3d 1307 (9th Cir. 2004) (en banc).[9] And, the habeas writ indisputably extends to prisoners being held "in violation of the Constitution or laws or treaties of the United States," 28 U.S.C.A. § 2241(c)(3).

Neither *Plaster*, nor the application of the *Plaster* rule here, contradicts *Neely*. Certainly, prior to the CAT and the FARR Act, the conclusion of the Supreme Court that individuals being extradited are not constitutionally entitled to any particular treatment abroad rendered evidence of the treatment they were likely to receive irrelevant in the context of a claim on habeas that their detention contravened federal law. *See Peroff*, 542 F.2d at 1249. It stood to reason that, absent any federal right to particular treatment in the requesting country, any refusal of extradition based on the treatment a fugitive was likely to

---

[9]In a previous appeal by Cornejo-Barreto, the Ninth Circuit concluded that a fugitive could file a habeas petition to obtain APA review of his claim that he would likely be tortured if he were extradited. *See Cornejo-Barreto v. Seifert (Cornejo-Barreto I)*, 218 F.3d 1004, 1015-16 (9th Cir. 2000). However, a different panel of that court subsequently determined that the earlier panel's statement was only dicta. *See Cornejo-Barreto II*, 379 F.3d at 1082-83. Considering the issue anew, the second panel determined that a fugitive indeed is not entitled to judicial review under such circumstances. *See id.* at 1084-89.

receive would have to be made by the Executive. *See Kin-Hong*, 110 F.3d at 109 ("The Secretary may . . . decline to surrender the relator [based] on . . . humanitarian . . . considerations."). However, the FARR Act now has given petitioners the foothold that was lacking when the Court decided *Neely*.

In arguing that the rule of non-inquiry bars habeas review here, the Government relies on decisions of other circuits that have expanded the justifications for the rule of non-inquiry since its origin. Several of these cases have reasoned that not only has the extradition power historically been vested exclusively in the Executive, but the Executive is uniquely suited for that role. *See, e.g.*, *Kin-Hong*, 110 F.3d at 110-11. These courts have determined that courts are "ill-equipped as institutions" to second-guess the Executive's extradition decisions. *United States v. Smyth (In re Requested Extradition of Smyth)*, 61 F.3d 711, 714 (9th Cir. 1995); *see Cornejo-Barreto II*, 379 F.3d at 1083 ("[T]he decision to surrender [a fugitive], unlike the probable cause determination that a judicial officer makes, involves sensitive foreign-policy judgments about how the fugitive is likely to be treated if returned to the requesting country; whether to seek assurances about the protections that will be afforded to him, at what level to obtain them, and how to evaluate such assurances as are given; and the nature of diplomatic relations between the United States and the requesting foreign state at the time.").

Some courts have also noted that the rule of non-inquiry is warranted because courts are "ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems." *Smyth*, 61 F.3d at 714. They have concluded that "interests of international comity are ill-served by requiring a foreign nation . . . to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced." *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990); *see* Semmelman, 76 Cornell L. Rev. at 1230-31 (stating that a judicial decision to enjoin extradition for humanitarian reasons "could lead to a retaliatory refusal to extradite" and "potentially affect the relations" between the countries).[10]

---

[10]It is noteworthy, though, that even prior to the CAT and the FARR Act, several courts, including this one, had suggested that proof that the

Relying on these cases, the Government maintains that regardless of the fact that the Secretary's extradition of Mironescu would violate federal law if extradition will likely result in Mironescu's torture, the rule of non-inquiry should preclude habeas review here because courts are ill-equipped to "second-guess[ ] the expert opinion of the State Department" regarding whether torture is likely to occur in Romania. Br. for the Appellants at 20. We do not agree. It is important to emphasize that a habeas court reviewing CAT or FARR Act claims would not be called upon to consider whether extradition would further our foreign policy interests or, if so, how much to weigh those interests. Rather, it would be required to answer only the straightforward question of whether a fugitive would likely face torture in the requesting country. American courts routinely answer similar questions, including in asylum proceedings and in applying the political offense exception, under which the political nature of and motivation for a crime may negate extraditability. *See* Andrew J. Parmenter, Comment, *Death by Non-Inquiry: The Ninth Circuit Permits the Extradition of a U.S. Citizen Facing the Death Penalty for a Non-violent Drug Offense [Prasoprat v. Benov, 421 F.3d 1009 (9th Cir. 2005)]*, 45 Washburn L.J. 657, 665-66, 674-75 (2006); *see also Ordinola*, No. 06-6126, slip op. at 13 (observing that "the vast majority of modern-day extradition treaties" provide political offense exceptions). We have no reason to doubt that district courts could adequately perform this function in this context as well.

The Government also maintains that concerns regarding international comity—especially the possibility of delays that habeas review

---

relator would be tortured if extradited might warrant habeas relief. *See, e.g.*, *Prushinowski*, 734 F.2d at 1019 ("It is unlikely that extradition would be ordered [by the court] if the facts were established . . . that the prisons of a foreign country regularly opened each day's proceedings with a hundred lashes applied to the back of each prisoner who did not deny his or her God or conducted routine breakings on the wheel for every prisoner."); *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960) (suggesting that extradition would be reexamined if court found that relator, upon extradition, would receive treatment so severe as to be "antipathetic to a federal court's sense of decency"); John Quigley, *The Rule of Non-Inquiry and Human Rights Treaties*, 45 Cath. U. L. Rev. 1213, 1242-47 (1996) (collecting cases).

could cause—warrant application of the rule of non-inquiry. That habeas review may delay extradition, or preclude it altogether, cannot negate Mironescu's right to obtain habeas relief if he is being detained in violation of federal law, just as such considerations did not negate Plaster's right to assert his constitutional claim. *See Plaster*, 720 F.2d at 349. Indeed, *Plaster* specifically recognized that habeas proceedings regarding claims that extradition would be unconstitutional "will often involve delicate questions of international diplomacy." *Id.* Moreover, one could well argue that the damage done to our foreign relations with another country is likely to be less when a court, as opposed to the Secretary, makes the decision that extradition must be denied. *See Quinn v. Robinson*, 783 F.2d 776, 789 (9th Cir. 1986); John Quigley, *The Rule of Non-Inquiry and Human Rights Treaties*, 45 Cath. U. L. Rev. 1213, 1240-41 (1996).

Finally, the Government suggests that habeas review concerning the treatment a fugitive would likely receive in the requesting country might compromise the confidentiality of certain sensitive communications between the Executive and a foreign government. However, we have no reason to doubt that district courts can adequately protect the confidentiality of such communications by considering them *in camera*, as the district court intends to do here. *See Quinn*, 783 F.2d at 788. For all of these reasons, we hold that, in light of the Secretary's conceded obligation under the FARR Act not to extradite Mironescu if he is likely to face torture, the rule of non-inquiry does not bar habeas review of the Secretary's extradition decision. *But see Cornejo-Barreto II*, 379 F.3d at 1088.

## B.

Despite our holding regarding the rule of non-inquiry, we nevertheless conclude that the district court erred in denying the Government's motion to dismiss on the basis that § 2242(d) of the FARR Act bars consideration of Mironescu's petition.

In interpreting a statute, we must first "determine whether the language at issue has a plain and unambiguous meaning." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Our determination of whether a statute is ambiguous is guided "by reference to the language itself, the specific context in which that language is used, and

the broader context of the statute as a whole." *Id.* at 341. If the language is plain and "the statutory scheme is coherent and consistent," we need not inquire further. *United States v. Ron Pair Enters.*, 489 U.S. 235, 240-41 (1989). In that situation, "the sole function of the courts is to enforce [the statute] according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485 (1917). Importantly, though, "where a provision precluding review is claimed to bar habeas review," such a provision, to have that effect, must include "a particularly clear statement" that habeas review is precluded. *Demore v. Kim*, 538 U.S. 510, 517 (2003).

Section 2242(d) states:

> Notwithstanding any other provision of law, and except as provided in the regulations described in subsection (b), . . . nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. § 1252).

This language plainly conveys that although courts may consider or review CAT or FARR Act claims as part of their review of a final removal order, they are otherwise precluded from considering or reviewing such claims. As Mironescu presents his claim as part of his challenge to extradition, rather than removal, § 2242(d) clearly precluded the district court from exercising jurisdiction.

In reaching the contrary conclusion, the district court suggested that exercising jurisdiction over Mironescu's petition would not be interpreting the FARR Act to "provid[e] any court jurisdiction" to consider the claims insofar as the habeas statute provided the jurisdiction. *See* J.A. 141 ("The FARR Act states that 'nothing in this section shall be construed as providing any court *jurisdiction* to consider or review claims raised under the [CAT].' It does not specifically preclude habeas jurisdiction." (citation omitted)); *see Saint Fort v. Ashcroft*, 329 F.3d 191, 201 (1st Cir. 2003). However, this interpretation of "provid[e] . . . jurisdiction" is squarely at odds with the language

in § 2242(d) indicating that the FARR Act may "provid[e] . . . jurisdiction to consider or review" CAT or FARR Act claims only "as part of the review of a final order of removal." *See Cornejo-Barreto II*, 379 F.3d at 1086 ("While § 2242(d) plainly contemplates judicial review of final orders of removal for compliance with the Torture Convention and the FARR Act, it just as plainly does not contemplate judicial review for anything else."). *But see Cornejo-Barreto v. Seifert (Cornejo-Barreto I)*, 218 F.3d 1004, 1013 (9th Cir. 2000) (concluding that "[t]he FARR Act does not preclude judicial review of the Secretary's implementation of the Torture Convention" without discussing whether the relevant language from § 2242(d) constitutes such a preclusion).

The district court also concluded that *INS v. St. Cyr*, 533 U.S. 289 (2001), supported its exercise of jurisdiction over Mironescu's petition. *Cf. Cadet v. Bulger*, 377 F.3d 1173, 1182-83 (11th Cir. 2004) (holding that FARR Act did not preclude habeas jurisdiction in immigration context); *Singh v. Ashcroft*, 351 F.3d 435, 441-42 (9th Cir. 2003) (same); *Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 216-18 (3d Cir. 2003) (same); *Saint Fort*, 329 F.3d at 200-02 (same); *Wang v. Ashcroft*, 320 F.3d 130, 141-43 (2d Cir. 2003) (same).[11] In *St. Cyr*, the respondent pleaded guilty to an aggravated felony in 1996 and became subject to deportation and eligible for a discretionary waiver thereof. *See St. Cyr*, 533 U.S. at 293, 314-15. The Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214, and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009-546, went into effect shortly thereafter. *See St. Cyr*, 533 U.S. at 293. The government maintained that these acts precluded most removal orders from "judicial review" and repealed the discretionary waiver of deportation previously available under § 212(c) of the Immigration and Nationality Act (INA). *See id.* at 293, 297, 310-11. The government argued that the jurisdiction-stripping provisions left St. Cyr with no forum to litigate the question of whether the pre-

---

[11]Since these cases were decided, Congress enacted the REAL ID Act, *see* REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, eliminating habeas review for the purpose of challenging removal orders. *See* 8 U.S.C.A. § 1252(a)(5) (West 2005); *Jahed v. Acri*, 468 F.3d 230, 233 (4th Cir. 2006).

viously available discretionary waiver was still available. *See id.* at 297. The Court ruled against the government, invoking two presumptions—the "strong presumption in favor of judicial review of administrative action," and the proposition that "[i]mplications from statutory text or legislative history are not sufficient to repeal habeas jurisdiction; instead, Congress must articulate specific and unambiguous statutory directives to effect a repeal." *Id.* at 298-99.

The *St. Cyr* Court concluded that the provisions at issue did not unambiguously repeal habeas jurisdiction in that context. *See id.* at 314. The Court reasoned that AEDPA and IIRIRA only expressly provided for the repeal of "judicial review" or "jurisdiction to review" without specifically mentioning habeas corpus. *See id.* at 311-14. Citing *Heikkila v. Barber*, 345 U.S. 229 (1953), the Court observed that "[i]n the immigration context, 'judicial review' and 'habeas corpus' have historically distinct meanings." *Id.* at 311. *Heikkila*, in turn, explained that "the function of the [habeas] courts has always been limited to the enforcement of due process requirements," which is quite distinct from "deciding on the whole record whether there is substantial evidence to support administrative findings of fact." *Heikkila*, 345 U.S. at 236 (internal quotation marks omitted); *see St. Cyr*, 533 U.S. at 312. The *St. Cyr* Court therefore concluded that in the absence of any "explicit[ ] mention[ ]" of habeas or § 2241 in the statutes, they did not conclusively demonstrate an intent on the part of Congress to preclude habeas review in an immigration context. *St. Cyr*, 533 U.S. at 312.

The Court further reasoned that interpreting the jurisdiction-stripping provisions to bar court review of a "pure question of law" would raise "substantial constitutional questions" in that it could violate the Suspension Clause.[12] *Id.* at 300. *St. Cyr* explained that "at the absolute minimum, the Suspension Clause protects the writ as it existed in 1789"[13] and that the writ in 1789 was available to address

---

[12]The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2.

[13]The Court left open the question of whether the Suspension Clause protects the habeas writ only to the extent that it existed in 1789, only to the extent that it existed after the 1867 amendment extending protection of the writ to state prisoners, or as it currently exists in light of subsequent legal developments. *See id.* at 300-01.

errors of law. *Id.* at 301, 302 (internal quotation marks omitted). Thus, because a reading of the statutes that did not preclude habeas was "fairly possible," *id.* at 300 (internal quotation marks omitted), the Court held that habeas jurisdiction remained available to St. Cyr. *See id.* at 314.

We conclude that *St. Cyr* is not dispositive here. Critical to both bases for the *St. Cyr* result was the existence of a plausible reading of the statutes before the Court under which habeas review of the claim at issue was not barred. The same cannot be said for § 2242(d) in this case. Although § 2242(d) resembles two of the statutes before the *St. Cyr* Court, *see* 8 U.S.C. § 1252(a)(2)(C), 8 U.S.C. § 1252(b)(9) (1994 ed., Supp. V),[14] the difference between § 2242(d) and the other two statutes eliminates the ambiguity on which *St. Cyr* was based. *But cf. Ogbudimkpa*, 342 F.3d at 217 (holding, in an immigration context, that § 2242(d) "closely mirrors" the version of 8 U.S.C. § 1252(a)(2)(C) at issue in *St. Cyr* and is not sufficiently distinguishable to preclude habeas review); *Saint Fort*, 329 F.3d at 200-01 (similar). Except in the context of immigration proceedings, § 2242(d) flatly prohibits courts from "consider[ing] . . . claims" raised under the CAT or the FARR Act. This preclusion plainly encompasses consideration of CAT and FARR Act claims on habeas review.

Furthermore, in addition to the critical difference in the statutory language, the fact that Mironescu's claim challenges his extradition rather than his removal is significant. The historical dichotomy in the immigration context between the "limited role played by the courts in habeas corpus proceedings," *St. Cyr*, 533 U.S. at 312, and judicial review in which a court "decid[es] on the whole record whether there is substantial evidence to support administrative findings of fact,"

---

[14]Section 1252(a)(2)(C) stated, "Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" certain enumerated offenses. Section 1252(b)(9) provided that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."

*Heikkila*, 345 U.S. at 236 (internal quotation marks omitted), on which the *St. Cyr* Court based its conclusion that the statutes before it did not clearly bar habeas, does not exist with regard to a claim that a fugitive's extradition will result in a violation of his federal rights, *see Plaster*, 720 F.2d at 347-49 (holding that district court on habeas review possessed jurisdiction to resolve constitutional challenge against extradition, including finding facts underlying constitutional claim). Indeed, Mironescu himself has sought review under the APA in the context of a habeas proceeding. Thus, for both of these reasons, § 2242(d) plainly demonstrates Congress' intent to preclude consideration of CAT and FARR Act claims on habeas review of an extradition challenge.

In light of the clear demonstration of Congressional intent here, affirmance would amount to a holding that Congress must always *explicitly* mention habeas or § 2241 in order to bar habeas review. *See Cadet*, 377 F.3d at 1182 (adopting that rule); *Wang*, 320 F.3d at 141 (same). Although some language in *St. Cyr* and *Demore* suggests that the Supreme Court could adopt this rule in the future, until it does so, we see no basis for refusing to give effect to Congress's unambiguously expressed intention that courts reviewing extradition challenges may not consider CAT or FARR Act claims. *See West v. Anne Arundel County*, 137 F.3d 752, 757 (4th Cir. 1998) ("Our task . . . is not to predict what the Supreme Court might do but rather to follow what it has done."). Indeed, prior Supreme Court precedent establishes that such a formalistic approach to the plain statement rule is not justified. *Cf. Gregory v. Ashcroft*, 501 U.S. 452, 467 (1991) ("This [the plain-statement requirement] does not mean that the [Age Discrimination in Employment Act] must mention [state] judges explicitly, though it does not. Rather, it must be plain to anyone reading the Act that it covers judges." (citation omitted)); *St. Cyr*, 533 U.S. at 299 n.10 (citing *Gregory* in support of the rule requiring a clear statement of Congressional intent); *id.* at 333-34 (Scalia, J., dissenting) (explaining that there is no basis for interpreting clear statement rule to require explicit reference to habeas). Although *St. Cyr* relied on the fact that the statutes there at issue did not "explicitly mention[ ]" habeas or § 2241, *St. Cyr*, 533 U.S. at 312, it listed that fact as only one consideration supporting its conclusion that the statutes were not sufficiently clear to bar habeas review. Indeed, the Court undertook a similar analysis in *Demore*, noting that the statute under consideration there

did not explicitly mention habeas, but basing its holding on the existence of a plausible reading of the statute that would not bar such consideration. *See Demore*, 538 U.S. at 516-17; *see also United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992) (holding that statute did not plainly indicate intent to waive sovereign immunity from monetary claims when it was "susceptible of at least two interpretations that do *not* authorize monetary relief"); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985) (holding that statute did not plainly indicate intent to waive sovereign immunity when it appeared only to authorize legislature to waive sovereign immunity). Thus, in light of the absence of any other plausible reading, we interpret § 2242(d) as depriving the district court of jurisdiction to consider Mironescu's claims.[15]

### III.

In sum, for the foregoing reasons, we conclude that the district court erred in denying the Government's motion to dismiss. Accord-

---

[15]The district court lacks the authority to review Mironescu's claims under the APA for the same reason. *See* 5 U.S.C.A. § 701(a)(1) (providing that APA review of an agency decision is not available if "statutes preclude judicial review"). Mironescu also maintains that the habeas court had jurisdiction to consider his CAT claim independent of the FARR Act. But, this contention fails as well because the CAT is not a self-executing treaty. *See Raffington v. Cangemi*, 399 F.3d 900, 903 (8th Cir. 2005); *Auguste v. Ridge*, 395 F.3d 123, 132-33 & n.7, 140 (3d Cir. 2005); *Reyes-Sanchez v. U.S. Attorney Gen.*, 369 F.3d 1239, 1240 n.1 (11th Cir. 2004); *Castellano-Chacon v. INS*, 341 F.3d 533, 551 (6th Cir. 2003); *Saint Fort*, 329 F.3d at 202; *Wang*, 320 F.3d at 140.

We also note that Mironescu does not argue that denying him the opportunity to present his CAT and FARR Act claims on habeas review violates the Suspension Clause. We therefore do not address that issue. *See Hillman v. IRS*, 263 F.3d 338, 343 n.6 (4th Cir. 2001) (explaining that "Rule 28(b) [of the Federal Rules of Appellate Procedure] requires" that appellees state their contentions and the reasons for them "at the risk of abandonment of an argument" not presented); *United States v. Ford*, 184 F.3d 566, 578 n.3 (6th Cir. 1999) ("Even appellees waive arguments by failing to brief them.").

ingly, we vacate the district court order enjoining Mironescu's extradition and remand for dismissal of Mironescu's petition.

*VACATED AND REMANDED*