Reversed and remanded by published opinion. Judge NIEMEYER wrote the opinion, in which Judge MICHAEL joined. Senior Judge STAMP wrote a separate opinion concurring in the judgment.
*195 OPINION
NIEMEYER, Circuit Judge:
The district court denied FBI Agent Seung Lee qualified immunity in connection with his investigation and interrogation of Kenzi Snider for the murder of a fellow exchange student, Jamie Penich, in Seoul, South Korea. During Lee’s interrogations, Snider repeatedly confessed to the murder. When South Korea requested extradition, a hearing was conducted in the United States before a magistrate judge, who rejected Snider’s claim that her confessions were coerced and concluded that probable cause existed for her extradition. The Secretary of State then extradited Snider to South Korea for trial.
After Snider was acquitted by South Korean courts, she commenced this Bivens[1] action against Lee and others for an array of constitutional violations, all of which the district court dismissed except for Snider’s Fourth Amendment claim for malicious prosecution based on her allegation of “wrongful extradition.”
Because Snider did not identify, in the circumstances of this case, a well-established constitutional violation, we conclude that Agent Lee is entitled to qualified immunity and reverse.
I
On March 17, 2001, Kenzi Snider and Jamie Penich, American exchange students in South Korea, returned together to their hotel rooms in the Itaewon region of Seoul, South Korea, after socializing in a local bar with fellow students and U.S. Army personnel. Because Penich was intoxicated and unable to walk on her own, Snider assisted Penich back to her hotel room.
The next morning, Penich was found naked and dead in her room. The evidence showed that she had been stomped to death, and the South Korean coroner concluded that she had died from suffocation. South Korean police questioned the group of students, including Snider, but did not make any arrests. The evidence at the time suggested that Penich was murdered by one or two men, but that evidence was inconclusive, and the investigation languished. Snider returned to the United States and enrolled in Marshall University in Hunting ton, West Virginia.
In the face of demands from Penich’s family and political pressure, agents of the FBI stationed in Korea, including Agent Seung Lee, joined the investigation. In reviewing the statements taken at the time of the murder, the agents became concerned about discrepancies between Snider’s statements and the physical layout of the hotel room where Penich had been found, as well as the statements given by other students in the group. Based on their suspicions that Snider was not being completely truthful about her actions that night, Agents Mark Mansfield and Lee, as well as FBI polygrapher Mark DiVittis, traveled to Huntington, West Virginia, in February 2002 to speak with Snider.
The agents contacted Snider and invited her to come to the hotel where they were staying to answer some questions. Snider agreed to meet with the agents, and she set the time for the meeting, to take place on February 4, 2002. When Snider arrived at the hotel with a friend, the agents requested that the friend remain downstairs while the agents spoke with Snider in Agent Lee’s hotel room, and Snider agreed.
*196 At this first interrogation session— which all parties described as very friendly — the agents made clear that they were investigating Penich’s murder and stated that extradition of Penieh’s killer to South Korea would be difficult. They also cited cases where murders of Korean citizens by foreign nationals resulted in light sentences. Snider felt sufficiently comfortable to share with the agents that she had not been sleeping well since the murder and that she had been having strange dreams, including one about being attacked by a train and a shark at the same time. Agent DiVittis suggested to Snider that dreams about trains indicate sexual conflict. After three hours, the session ended, and Snider agreed to return the next day at a time of her choosing and to bring with her a written summary of what she remembered from the night of Pe-nich’s murder.
The next day, February 5, 2002, Snider arrived again at Agent Lee’s room and brought homemade ice cream to share with the agents. In response to the agents’ inquiry about her relationship with Penich, Snider stated that the two were close friends and that Penich had even confided in Snider that she was anorexic. Snider then gave the agents the handwritten statement that she had prepared the night before. This statement was generally consistent with her earlier statement given at the time of the murder but contradicted some details. When asked about the discrepancies, Snider explained that her present statement was different from her previous statement because she “didn’t remember [the additional details] at the time.”
Agent DiVittis then confronted Snider, telling her that the investigation showed that she murdered Penich. In making this accusation, however, DiVittis allowed how Snider probably “didn’t mean to” and that perpetrators often “hide a memory and cover it up with another one” so that they can “handle it.” Snider became upset by the accusation and left the room. A moment later, however, she returned.
After she returned to the room, Snider asked the agents if she needed an attorney. The agents told her that a lawyer would just complicate things and that if she had an attorney, they would not be able to say that she had fully cooperated. Snider did not bring up the subject of an attorney again. The agents then suggested that Snider was repressing her true memories of the night. But before asking additional questions, they asked her, “Do you want to do this?” Snider indicated that she was willing to answer additional questions. When Agent DiVittis asked Snider about her emotions towards Penich, Snider stated that although she did not feel lustful toward other women, she had become excited when Penich undressed in front of her on the night of the murder. Agent DiVittis then asked Snider to recount step-by-step her actions on the night of the murder.
Snider, now sitting in a chair hunched over with her eyes closed, began to confess in detailed fashion how she murdered Pe-nich. She recounted a sexual encounter with Penich that resulted in Snider becoming angry, striking Penich, and then killing her by stomping on her head. Agents prompted Snider whenever she would pause by asking ‘What did you do then?” or “How did you move the body?” or “What set you off in a panic?” Several of the details provided by Snider corresponded to what the agents knew about the evidence at the crime scene. They noted that the bruising on Penich’s face was consistent with Snider’s confession that she slapped Penich; that the bruising on Penich’s back was consistent with Snider’s confession that she dropped Penich on the *197 bathtub; and that the way Penich’s clothes were arranged on the floor corresponded with Snider’s story that Penich had undressed seductively in front of her, removing both jeans and underwear at the same time. This statement contradicted Snider’s earlier statement that she had left Penich alone in the hotel room dressed only in her underclothes. Snider also now stated that she returned to her hotel room only once that night, contrary to her earlier statement but consistent with the testimony of her roommate. Snider concluded her statement to the agents by saying that she locked the door to her hotel room that night in order to lock out the bad thoughts of the murder.
The three agents then left the room for a moment. When they returned, Snider, without prompting, gave them additional details of the murder. When the agents asked if she would come back the next day to make a formal statement, she agreed and again set the time for the meeting. The agents then followed Snider home to retrieve the clothing that she was wearing on the night of the murder and departed.
The next day, February 6, 2002, Snider returned to the hotel room as agreed and again recounted the sexual encounter and subsequent murder, adding additional details that she “remembered” the night before. The agents wrote a summary of her confession, which Snider then read and signed. The statement specifically noted that Snider had not been promised anything or threatened by the agents. Before she left, the agents fingerprinted and photographed her and told her not to leave the State without permission. Snider thereafter withdrew from school.
Several weeks later, on the petition of South Korea and at the request of the State Department, Snider was arrested and taken into custody. At the time, she signed a Miranda waiver and repeated the same confession to her arresting officers that she had given at the hotel room to the agents questioning her then.
At the extradition hearing, Snider testified for the first time that Agents Mansfield, Lee, and DiVittis had coerced her. She stated that she did not believe that her confession was based on true memories and that she was “not confident” that her statements about the night of the murder were accurate. Snider asserted that, because the agents challenged her version of the events that night, as well as her memory of them, she had simply tried to find the right memories. When asked why she never retracted the confession, even after being arrested, Snider stated that she did not know that retraction was an option. Finally, when asked if she murdered Penich, Snider stated, “Not by the memories I hold true.” She never asserted unequivocally that she did not murder Penich.
At the extradition hearing, Snider also produced an expert on coerced confessions, who testified that introducing any discussion of punishment into the interrogation increases the chance of a false confession. He also stated that this tactic of interrogation “may create false confessions.” The expert admitted that his opinion and studies were based on observations and that there were no controlled experiments to verify his hypothesis. When asked specifically about Snider’s confession, the expert stated that his examinations of the record “suggest strongly that it could be a false confession.” The expert also stated that the confession was “more likely to be the product of influence than the product of the actual experiences of having been there.”
At the conclusion of the evidence, the magistrate judge conducting the extradition hearing concluded that “the evidence presented does not establish that Ms. Sni *198 der’s will was ‘overborne’ or that her ‘capacity for self-determination [was] critically impaired’ by the manner in which she was interrogated.” (Citation omitted). Based on Snider’s confessions, their internal corroboration, and their corroboration by the other evidence, the judge concluded that there was probable cause to believe that Snider murdered Penich. The judge certified his findings and the evidence to the Secretary of State, who, pursuant to an extradition treaty between South Korea and the United States, elected to extradite Snider to South Korea. Snider did not challenge the extradition order.
Following trial in South Korea, Snider was acquitted by the Seoul District Court on June 19, 2003, and the acquittal was upheld by appellate courts, including, on January 13, 2006, the South Korean Supreme Court.
Snider commenced this Bivens action on May 24, 2007, alleging a variety of constitutional and state law claims. The district court dismissed all of her claims except for a claim for malicious prosecution because they were barred under the applicable statute of limitations. The court concluded that because the last element of her malicious prosecution claim—that Snider succeed in the criminal proceeding—occurred within two years of the filing of the complaint, the malicious prosecution claim was not time-barred. The district court also concluded that Agent Lee was not protected by qualified immunity. From the order denying qualified immunity on the malicious prosecution claim, Agent Lee filed this appeal.
II
The doctrine of qualified immunity protects government officials from civil damage actions to the extent that the officials do not violate clearly established constitutional rights. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Officials have qualified immunity either if the facts do not make out a violation of a constitutional right or if the right was not clearly established at the time. In this case, we need address only the first question, whether the plaintiff made out a violation of a constitutional right based on the facts submitted. See Pearson v. Callahan, — U.S. —, 129 S.Ct. 808, 815-16, 818-19, 172 L.Ed.2d 565 (2009).
In her complaint, Snider alleged that during the interrogations, Agent Lee manipulated her into giving a false confession by using misleading statements about the “psychological repression” of memory, by denying her the right to a lawyer, and by understating the consequences of a confession under South Korean law. She claimed that this conduct violated her rights under the Fourth and Fifth Amendments to be free from unreasonable seizures (including false arrest and false imprisonment), coercion leading to her confessions, the failure of government officials to intervene in the face of wrongful conduct, denial of counsel, and malicious prosecution (alleged as “wrongful extradition”).[2]
On Agent Lee’s motion, the district court dismissed all of Snider’s claims against Lee except her claim for malicious prosecution. And with respect to the claim for malicious prosecution, the district court denied Agent Lee’s claim of qualified immunity, without addressing the specific *199 reasons for doing so, although the court did refer to the fact that Snider’s rights to counsel, to “intervention,” and to be free from coercion “were clearly established.”
Snider devotes most of her brief to arguing that these facts, particularly the alleged coercion, justify her claim of wrongful seizure under the Fourth Amendment because her seizure was not supported by probable cause. She reasons that Agent Lee improperly coerced a confession to create the probable cause and that, absent the confessions, there was no other evidence to support her arrest. But Snider cannot rely solely on the unreasonableness of her seizure even though her substantive allegations with respect to her seizure might amount to a violation of the Fourth Amendment. The district court already concluded that Snider’s time for bringing her claims based on a wrongful seizure alone has long passed. Snider was arrested for extradition on February 28, 2002, and therefore should have brought any allegations of improper arrest or wrongful seizure within two years of that date. Yet she did not file her complaint in this action until May 24, 2007, over five years after her arrest.
To avoid the limitations issue, Snider alleges malicious prosecution, of which wrongful seizure is only an element. To satisfy the other element, she relies on her acquittal in the trial in South Korea.
While it is not entirely clear whether the Constitution recognizes a separate constitutional right to be free from malicious prosecution, see Albright v. Oliver, 510 U.S. 266, 279-80 n. 5, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, J., concurring); Lambert v. Williams, 223 F.3d 257, 261-62 (4th Cir.2000), if there is such a right, the plaintiff must demonstrate both an unreasonable seizure and a favorable termination of the criminal proceeding flowing from the seizure. In Lambert we explained:
Our analysis in Brooks [v. City of Winston-Salem, 85 F.3d 178 (4th Cir.1996) ], understood in light of these precedents, makes clear that there is no such thing as a “ § 1983 malicious prosecution” claim. What we termed a “malicious prosecution” claim in Brooks is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution — specifically, the requirement that the prior proceeding terminate favorably to the plaintiff.
223 F.3d at 262. In a footnote, we explained the significance of the second element of a malicious prosecution claim:
As we noted in Brooks, the significance of the favorable termination element is not only that it constitutes a prerequisite for recovery, but also that it establishes the time from which the claim accrues for purposes of determining whether the statute of limitations has run.
Id. at 262 n. 3 (emphasis added).
In short, even though Snider is time-barred from pursuing a claim for wrongful seizure under the Fourth Amendment, she is free to pursue a claim under the Fourth Amendment that has two elements — a wrongful seizure and a termination in her favor of the proceedings following her seizure. For the first element, Snider alleges that Agent Lee’s conduct — obtaining coerced confessions from her — improperly established probable cause for her arrest for the purpose of extradition to South Korea, And for the second element, she alleges that the criminal proceedings in South Korea terminated in her favor.
While Snider appropriately recognizes that “the criminal proceeding [following her seizure] must have terminated in *200 [her] favor,” she assumes without further discussion that the Korean acquittal satisfies this second element. Such an assumption, however, presumes that any protection under the Fourth Amendment against malicious prosecution extends to a prosecution in a foreign nation. Yet, Snider’s constitutional rights are not so far-reaching.
Snider’s seizure in the United States was effected by United States law enforcement officers, acting on a warrant issued pursuant to a complaint for extradition initiated at the request of Korea. She was not arrested to be tried for murder in the United States; rather, she was arrested to be subjected to an extradition hearing, the only U.S. judicial proceeding that occurred. Following that hearing, the U.S. judicial officer certified probable cause to the Secretary of State, who, acting under treaty and under statutorily conferred discretion, transferred Snider from the United States to South Korea for trial.
Extradition of a U.S. citizen to a foreign nation is an act of the Executive Department pursuant to a treaty between the United States and that foreign nation, see 18 U.S.C. § 3181(a), and a citizen of the United States may be extradited only upon the discretion of the Secretary of State, id. § 3186. “In deciding whether to extradite, the Secretary may consider factors affecting both the individual defendant as well as foreign relations — factors that may be beyond the scope of the ... judge’s review.” Mironescu v. Costner, 480 F.3d 664, 666 (4th Cir.2007) (internal quotation marks and citation omitted).
To be sure, before the Secretary of State considers extradition, the citizen is tried before a U.S. judicial officer on a complaint filed under oath, but the trial is conducted only to determine whether “the evidence of criminality” is “sufficient to sustain the charge under the provisions of the proper treaty.” 18 U.S.C. § 3184. If the judicial officer finds sufficient cause, the officer certifies that fact to the Secretary of State and transmits to the Secretary all of the evidence in the proceedings, id., and with that the U.S. judicial proceeding ends.
The process before the judicial officer on the extradition complaint is the judicial process that the United States affords a citizen being extradited, and after extradition, the citizen is tried under the laws of the foreign nation. The arrest of the citizen in the United States is made on a warrant issued after the complaint of extradition is filed to compel the citizen to attend the extradition hearing. See 18 U.S.C. § 3184 (authorizing “warrant for the apprehension of the person so charged [in the extradition complaint], that he may be brought before such [judicial officer], to the end that the evidence of criminality may be heard and considered [in the extradition proceeding]”); see generally Mironescu, 480 F.3d at 665-66. And the judicial officer’s certificate following the hearing is the final judgment in the United States proceedings. In general, it is subject only to collateral attack through a habeas corpus proceeding. See Mironescu, 480 F.3d at 669; In re Extradition of Howard, 996 F.2d 1320, 1325 (1st Cir.1993).
Thus, in this case, Snider was arrested only to compel her to appear at the hearing to determine the sufficiency of evidence for extradition. Upon completion of that judicial proceeding — which was subject to the protections of the Fourth and Fifth Amendments — the Executive Department, through the Secretary of State, made the discretionary decision to extradite Snider to South Korea. South Korea then followed its own process in trying her, and that process need not have *201 provided her with the protections of the U.S. Constitution. As the Supreme Court stated:
The currently received understanding of the Bill of Rights as instituted “to curtail and restrict the general powers granted to the Executive, Legislative, and Judicial Branches” of the National Government defined in the original constitutional articles was expressed early on in Chief Justice Marshall’s opinion for the Court in the leading case of Barron ex rel. Tiernan v. Mayor of Baltimore, 7 Pet. 243, 247, 8 L.Ed. 672 (1833): the Constitution’s “limitations on power ... are naturally, and, we think, necessarily applicable to the government created by the instrument,” and not to “distinct [state] governments, framed by different persons and for different purposes.”
United States v. Balsys, 524 U.S. 666, 674-75, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998) (emphasis added) (citation omitted). In Balsys, the defendant declined to answer a question about his activities during World War II for fear of prosecution by Lithuania or Israel. The Supreme Court held “that concern with foreign prosecution is beyond the scope of the Self-incrimination Clause.” Id. at 669, 118 S.Ct. 2218. In reaching its holding, the Supreme Court stated that even though the defendant’s fear of prosecution by a foreign nation might be reasonable, the criminal prosecution by a foreign government was nonetheless not subject to U.S. constitutional guarantees. Id. at 672-74, 118 S.Ct. 2218.
Likewise, Snider may not rely on her acquittal by the South Korean courts to satisfy her burden of demonstrating termination of the proceedings in her favor in connection with a seizure in the United States. The seizure in the United States was for purposes of conducting the extradition hearing, not the murder trial, and the extradition hearing did not terminate in Snider’s favor. The U.S. magistrate judge rejected Snider’s contentions that her various confessions were coerced. That ruling was a final judgment, and Snider did not challenge it collaterally through a habeas corpus proceeding. It is the extradition proceeding to which we must look for determining whether Snider was successful for purposes of a malicious prosecution claim under the Fourth Amendment because her seizure was effected only for the purpose of conducting the extradition hearing. Moreover, even if the successful outcome in South Korea could be causally relevant — a proposition that is not clear inasmuch as the South Korean trial depended on the Secretary of State’s discretionary decision to make Snider available for that trial — the Supreme Court has made clear that U.S. constitutional protections do not extend to foreign prosecutions. See Balsys, 524 U.S. at 700, 118 S.Ct. 2218 (“mere support of one nation for the prosecutorial efforts of another does not transform the prosecution of the one into the prosecution of the other”).
Because there was no favorable outcome in the U.S. proceedings, as necessary to support Snider’s malicious prosecution claim under the U.S. Constitution, Snider fails on the threshold inquiry of whether she alleged the violation of a constitutional right. While we recognize that Snider did allege constitutional violations in connection with her interrogation and arrest, these claims are not before us. Our holding is limited to Snider’s claim that Agent Lee violated her well-established U.S. constitutional right to be free from malicious prosecution in the United States. Because she has not alleged a violation of such a right, Agent Lee is entitled to qualified immunity.
Accordingly, we reverse and remand for dismissal of Snideris claim against Agent Lee for malicious prosecution.

REVERSED AND REMANDED

. Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

. Snider captioned Count II of her complaint as "Deprivation of Right to Fair Trial, Wrongful Extradition and Wrongful Imprisonment” under the "5th Amendment.” The district court concluded that this count should best be taken as a claim for malicious prosecution under the Fourth Amendment, and Snider accepts that view.